## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**MARLYN WEBB AND
PAULINE SANCHEZ,**

   **Plaintiffs.**

**v.**           **CASE NO.** _____

**MICHAEL PADILLA,
RAYMOND SCHULTZ,
MARTIN CHAVEZ,
AND CITY OF ALBUQUERQUE,**

   **Defendants.**

### COMPLAINT FOR EMPLOYMENT DISCRIMINATION AND RETALIATION,  AND BREACH OF CONTRACT

  Plaintiffs, Marlyn Webb and Pauline Sanchez, by and through their attorneys Louren Oliveros and Robert J. Gorence of Gorence & Oliveros, P.C., hereby submit this complaint for violations of their civil rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. §§ 1981 and 1983, the Fourteenth Amendment to the United States Constitution, the New Mexico Human Rights Act, and New Mexico state law.

### JURISDICTION AND VENUE

  1.  The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. §§ 1981, 1981a, 1983, 1988, 2000e-2 and 2000e-5, with pendent jurisdiction over the state law claims.

  2.  Venue is proper in the District of New Mexico under 28 U.S.C. § 1391 because all of the acts complained of occurred, and Plaintiffs' cause of action arose, in New Mexico.

## PROCEDURAL HISTORY

3.      Plaintiff Webb filed a complaint with the New Mexico Department of Labor, Human Rights Division (HRD) and the United States Equal Employment Opportunity Commission (EEOC), alleging employment discrimination on the basis of gender and retaliation in violation of Title VII and the New Mexico Human Rights Act.

4.      On December 6, 2007, the Human Rights Division (hereinafter referred to as "HRD") issued a Determination of Probable Cause on Plaintiff Webb's charge.

5.      On January 30, 2008, the HRD mailed Plaintiff Webb a Notice of Waiver of Hearing.

6.      Plaintiff Webb's Complaint is timely filed on or before April 29, 2008.

7.      Plaintiff Sanchez filed a complaint with the HRD and the United States Equal Employment Opportunity Commission (EEOC), alleging employment discrimination on the basis of gender and retaliation in violation of Title VII and the New Mexico Human Rights Act.

8.      On March 14, 2008, the HRD issued a Determination of Probable Cause/No Probable Cause on Plaintiff Sanchez's charge.

9.      On March 19, 2008, the HRD mailed Plaintiff Sanchez a Notice of Waiver of Hearing.

10.     Plaintiff Sanchez's Complaint is timely filed on or before June 17, 2008.

11.     Plaintiffs have exhausted their administrative remedies under Title VII and the New Mexico Human Rights Act, and all remedies with the EEOC.

## PARTIES

12.     Plaintiff Marlyn Webb is a female resident and citizen of New Mexico.

13.     Plaintiff Pauline Sanchez is a female resident and citizen of New Mexico.

14.     At all material times, Plaintiffs were employees of the Defendant City of

Albuquerque Emergency Communications Center (herein after referred to as

"Communications.")

15.     Before November 2006, Defendant Michael Padilla was the manager of the

Defendant City's 311 Call Center.   From approximately November, 2006 through April, 2007,

Defendant Padilla  was the Director of Communications, a management-level employee of the

City, and he exercised supervisory control and authority over Plaintiffs.

16.     Defendant Padilla is sued in his individual capacity.  At all material times through

April  2007, Defendant Padilla acted under color of state law.

17.     Defendant Raymond Schultz is sued in his individual capacity.  At all material

times Defendant Schultz was a policy maker employed by the City of Albuquerque and he was a

direct supervisor of and had authority over Plaintiffs and Defendant Padilla.  At all material

times, Defendant Schultz acted under color of law.

18.     Defendant Martin Chavez is sued in his individual capacity.  At all material times

Defendant Chavez was a policy maker employed by the City of Albuquerque and he was a direct

supervisor of and had authority over Plaintiffs and Defendant Padilla.  At all material times,

Defendant Chavez acted under color of law.

19.     Defendant City of Albuquerque ("Defendant City") is a governmental entity by

whom Plaintiffs were employed at all material times.  The City is an employer as contemplated

by the New Mexico Human Rights Act, NMSA 1978 § 28-1-2 and Title VII of the Civil Rights

Act, 42 U.S.C. 2000e-(b), and employs more than 500 persons.

20.     Defendant City is responsible and liable for the acts and omissions of its agents

and employees, including, but not limited to, Defendant Padilla, Defendant Schultz, Defendant

Chavez, Pete Dinelli, Bruce Pearlman, Deputy Chief Michael Castro, Nick Bakas, and Captain

Steve Warfield.

## FACTUAL BACKGROUND

21.     Plaintiff Webb worked as the Assistant Communications Manager for

Communications from August 2006 through April 20, 2007.

22.     Plaintiff Webb has consistently received positive evaluations for her job

performance and has been promoted several times during her twenty-two-year career at the City

of Albuquerque.

23.     Plaintiff Sanchez worked as the Communications Manager for Communications

from October 2005 through April 20, 2007.

24.     Plaintiff Sanchez has consistently received positive evaluations for her job

performance and has been promoted several times during her twenty-four-year career at the City

of Albuquerque.

25.     In November 2006, the City of Albuquerque appointed Defendant Padilla to act as

a consultant to Communications.  After the appointment, he immediately assumed the role of

"director" of Communications.  Defendant Padilla also remained the manager of 311 at the City.

26.     Prior to his hiring, Defendant City failed to conduct a proper background check

on Defendant Padilla.

27.     Defendant Padilla was not adequately monitored or supervised by the City.  He was given absolute authority to make decisions at Communications.

28.     As Assistant Communications Manager, Plaintiff Webb answered directly to Plaintiff Sanchez, and therefore to Defendant Padilla.  Plaintiff Webb also answered to Defendant Schultz and Defendant Chavez.

29.     As Communications Manager, Plaintiff Sanchez answered directly to her supervisor, Defendant Padilla.  Plaintiff Sanchez also answered to Defendant Schultz and Defendant Chavez.

30.     On several occasions, Defendant Padilla  specifically communicated to his subordinates, including Plaintiffs, that failure to precisely follow his directives would result in immediate termination.

31.     Defendant Padilla made numerous sexualized and disparaging comments directed to female subordinates, including Plaintiffs.

32.     On approximately January 2, 2007 at a staff meeting, Defendant Padilla threatened the entire staff with termination if they were not "on board" with him.

33.     At that meeting, Defendant Padilla looked directly at Plaintiff Webb and said "that's right I'm looking at you Darlin!"

34.     Defendant Padilla told Plaintiff Webb after the meeting, and on other occasions, that if she did not do as she was told that she "would be gone."

35.     On January 2 and January 9, 2007 as well as on other occasions, Defendant Padilla repeatedly told Plaintiffs and other City employees that he had the full authority of Mayor Chavez, Defendant Chavez, and that if they were not on board with him and his ideas,

they would be terminated.  He stated several times that Defendant Chavez would approve anything he requested.

36.     On several occasions between January 9 and January 31, 2007, Plaintiffs heard Defendant Padilla make comments like, "it may be 2007 out there, but in my house it is the 1950s and women stay home, make tortillas, and have babies." Sometimes these remarks were made privately to Plaintiffs and sometimes in the presence of other City employees.

37.     On approximately January 23, 2007, Defendant Padilla criticized Plaintiff Sanchez' management style and told her that career women want men to open doors for them and pay for dinner, but when it comes to work they don't want to be treated like a lady.  He again made the comment that, "it may be 2007 out there, but in my house it is 1969 and women take care of the kids, clean the house, and make tortillas." Defendant Padilla also made a similar comment to both Plaintiffs on or about February 8, 2007.

38.     On one occasion, Defendant Padilla asked Plaintiff Sanchez and a female supervisor to accompany him to the Tumbleweed Lounge so that he could find them a "one-legged man."

39.     While at work, Defendant Padilla asked Plaintiff Webb to accompany him to restaurants after hours on two separate occasions.  She declined both times.

40.     Defendant Padilla constantly made inappropriate comments about his personal appearance, private life, and romantic experiences which made Plaintiff Webb uncomfortable and were unwelcome.  He also regularly inquired into her personal affairs and dating status.

41.     At a briefing on March 1, 2007, Defendant Padilla falsely announced that he and Plaintiff Webb were "running away together" to Las Vegas, Nevada.

42.     During a meeting on approximately March 2, 2007, Defendant Padilla told Plaintiff Webb that he was writing a book about "pyscho women."  He said that one chapter would be called, "What Executive Women Really Need Is a Great Big Hug."

43.     On approximately March 5, 2007, Defendant Padilla sent an email to Albuquerque Police Department Deputy Chief Castro falsely stating that he and Plaintiff Webb were taking a private vacation together in Las Vegas, Nevada.  Defendant Padilla continued telling employees that Plaintiff Webb and he were taking the vacation together even after Plaintiff Webb requested that he stop.

44.     Before being hired as the director of 911, a female working as the training supervisor of Communications, Michelle Lopez, reported to Plaintiff Sanchez that Defendant Padilla had conducted himself inappropriately by asking her out for dates on several occasions.

45.     The employee rejected Defendant Padilla's sexual advances, but he refused to stop pursuing her.

46.     In August 2006, Defendant Padilla harassed the female employee by appearing at her home in his vehicle.  Driving slowly in front of the employee's home, Defendant Padilla called out her name.  He claimed to be looking for a piece of vacant land to acquire.  This incident was reported to Deputy Chief Castro.

47.     Defendant Padilla continued his inappropriate conduct while acting as the supervisor's superior at Communications.  This continued conduct included asking the female supervisor about her romantic interests and the identity of her boyfriend.  Defendant Padilla also constantly made comments to the supervisor that he was close with the Mayor and that he could quickly have someone removed for not cooperating with him.

48.     Deputy Chief Castro told Defendant Padilla not to attempt to have romantic relations with the female supervisor while acting as her superior in Communications.

49.     Upon information and belief, Defendant Padilla also had inappropriate and discriminatory relationships with two female subordinates while he was the manager of 311.

50.     The Defendant City and Defendant Padilla's supervisors, including, but not limited to, Defendant Chavez and Defendant Schultz, had notice of Defendant Padilla's prior unlawful conduct and took no action to protect other females employees from Defendant Padilla.

51.     On or about March 1, 2007, Plaintiff Sanchez reported Defendant Padilla's discriminatory conduct to Deputy Chief Castro.

52.     A week later, on the morning of March 7, 2007, Plaintiff Webb, along with Plaintiff Sanchez and several other City employees, made formal complaints with the City of Albuquerque Employee Equity Office ("EEO") detailing the hostile work environment that Defendant Padilla created.

53.     On the very same day, after receiving a Notice of Investigation of Plaintiffs' complaint against him, Defendant Padilla circulated an interoffice memo which attacked their competence and called for their removal.

54.     On April 9, 2007, Plaintiffs were transferred out of Communications.  At a meeting attended by City employees, Nick Bakas, Defendant Schultz, Deputy Chief Castro, Deputy Director Bowdich, and Captain Warfield, Plaintiffs were informed that they were being temporarily transferred to another division as a result of their interaction with Defendant Padilla and that they would resume their positions after four months, when Defendant Padilla had completed a project.

8

55.     At that meeting, Plaintiffs were told that Plaintiff Webb would be transferred to the Academy substation to work on hiring and training, and that Plaintiff Sanchez would be transferred to the APD main to work on the Comprehensive Information System Project ("CISP") project.  Plaintiffs were informed that the transfers were effective immediately.

56.     Plaintiffs were told that their transfers were being made by order of Defendant Chavez.

57.     None of the other employees, who complained about the discrimination except the above-described female supervisor, were transferred and demoted, as were Plaintiffs.

58.     Deputy Chief Castro, who participated in the EEO investigation, was taken out of the chain of command in April, 2007. Deputy Chief Castro was a management-level employee of the City and a supervisor of Plaintiffs.  He was not demoted as Plaintiffs were.

59.     Pete Dinelli, was placed in Communications as interim manager and Dr. Bruce Perlman was placed in Communications as a manager-consultant.

60.     Plaintiffs reported to the Academy location, but discovered it was grossly inadequate for office space as it was a five by eight foot area that was used for storage.

61.     Defendant City never provided any paperwork or process related to Plaintiffs' transfers as required by City policy.

62.     On approximately April 10 or 11, 2007, at a shift briefing, Bruce Pearlman, Deputy Chief Castro and Captain Warfield informed the staff that Plaintiffs were not permitted on the property and would never be allowed back at Communications.

63.     On April 13, 2007, Plaintiffs met with City EEO Officer Angela Baldwin, at her request.  She indicated that Defendant City would be making an announcement about Defendant

Padilla on Monday, and that if they were not happy with the announcement, Defendant City would be willing to enter into negotiations with them.

64.     Defendant City gave Defendant Padilla a five-day suspension to be served at Defendant Padilla's convenience.  He later resigned of his own volition.

65.     On April 18, 2007, Plaintiffs were relocated to a substation in Old Town.  There were no other Communications employees at this location.

66.     At the Old Town substation, Plaintiffs had no support staff, few supplies and no managerial duties.

67.     On April 19, 2007, Plaintiff Sanchez told Plaintiff Webb that they were no longer associated with Communications and that they were not permitted to have any contact with anyone at Communications. Plaintiff Webb was also told that they were no longer allowed to be at the Communications Center.

68.     On April 19, 2007, Plaintiff Sanchez requested background information to commence work on hiring new employees and discovered that she was denied access to any hiring information.

69.     On April 23, 2007, Plaintiffs' computers at the Old Town substation were removed.

70.     On or about April 23, 2007, Pete Dinelli, through Captain Warfield, ordered that the female training supervisor in Communications, Ms. Michelle Lopez, have no contact, whether personal or professional, with Plaintiff Sanchez.

71.     The female supervisor was subjected to severe scrutiny and monitoring by the City.  On numerous occasions, Ms. Lopez was arbitrarily reprimanded.  She has been in constant fear of termination since reporting the discrimination of Defendant Padilla to the EEO.

72.     On May 3, 2007, Deputy Chief Castro told Plaintiff Webb that she and Plaintiff Sanchez were to work on the CISP project, but that they were still prohibited from having any contact with Communications.

73.     On May 7, 2007, City employee Claude Sanchez informed Plaintiff Webb that she and Plaintiff Sanchez were no longer permitted to have independent access which would allow them to log on to work on the CISP project.  They were only allowed to log on as Deputy Chief Castro.

74.     On May 16, 2007, Plaintiff Webb and Plaintiff Sanchez were instructed to work on the CISP project.  That project was a Communications project.  Because Plaintiffs were denied access to Communications, they could not perform their duties.

75.     Because Defendants prevented Plaintiff Sanchez from performing her assigned duties and because Plaintiff Sanchez had no meaningful managerial duties, Plaintiff Sanchez was forced into early retirement.

76.     Upon her forced resignation, Plaintiff Sanchez held the title of Communications Manager.

77.     After resigning, in March, 2008, Plaintiff Sanchez was offered a position with the City of Albuquerque through Captain Warfield pending funding.  Once funding was confirmed Plaintiff Sanchez was informed she would be hired.

11

78.     Notwithstanding the offer of employment, and Plaintiff Sanchez' acceptance, Captain Warfield told Plaintiff Sanchez that she would be denied the employment because of her "pending" sexual harassment litigation.

79.     As a result, Plaintiff Sanchez has lost income and job opportunities with the City.

80.     Plaintiff Webb is still working at the Old Town substation and holds the title of Communications Assistant Manager.

81.     As a part of the continuing retaliation by the City, Plaintiffs have not been promoted, nor received pay increases as have other Communications employees.

82.     Since reporting Defendant Padilla's sexual harassment to the City of Albuquerque EEO and later to the HRD, Plaintiffs have been demoted.  They have lost their support staff, management status, access to information, equipment and supplies, ability to supervise employees, and all contact with employees and management staff and other agencies in their department.

83.     Plaintiff Sanchez has lost income and benefits related to her forced early retirement.

84.     Plaintiffs have never been given an explanation about why they were no longer involved with Communications.

85.     Plaintiffs never been formally reprimanded for any incident related to Communications during their tenure as the management at Communications.

86.     Plaintiffs  have never received a negative evaluation since or during their tenure as the management at Communications.  Plaintiffs have not been promoted, nor received appropriate raises since their wrongful transfer and demotion.

87.     The conduct of Defendant Padilla, Defendant Chavez, Defendant Schultz, and Defendant City, through their agents and  employees, has caused Plaintiffs damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity and loss of income, loss of promotion opportunities, psychological harm, anxiety and distress.

88.     The conduct of Defendant Padilla, Defendant Chavez, Defendant Schultz, and Defendant City, through their agents and employees, has caused Plaintiff Sanchez to retire prematurely.

89.     Male employees in similar circumstances with Defendant City were treated differently by Defendants than were Plaintiffs.

<u>**COUNT I: TITLE VII DISCRIMINATION CLAIMS - DISPARATE TREATMENT AGAINST THE CITY OF ALBUQUERQUE**</u>

90.     Plaintiffs incorporate each allegation above as though fully set forth herein.

91.     Plaintiffs' status as females place them in a protected class under Title VII.

92.     Defendant City subjected Plaintiffs to adverse employment actions because of their sex in violation of Title VII.  The adverse employment actions include, but are not limited to, subjecting Plaintiffs to sexual harassment and discrimination, transferring Plaintiffs without cause and in violation of existing policy and procedures, demoting Plaintiffs, stripping Plaintiffs of their management responsibilities, denying Plaintiffs access to information, equipment and resources necessary for their employment, isolating and ostracizing Plaintiffs, and stripping Plaintiffs of meaningful job duties and responsibilities, loss of income and loss of promotion opportunities and pay raises.

13

93.     Defendant City treated Plaintiffs less favorably than similarly situated, male employees.

94.     Defendant City had no legitimate, nondiscriminatory, non-pretextual reason for subjecting Plaintiffs to these adverse employment actions.

95.     Defendants' wrongful actions caused Plaintiffs damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity and loss of income, loss of promotion opportunities, and psychological harm, anxiety and distress.

96.     The conduct of Defendant City was intentional, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiffs' right so as to warrant punitive damages.

### COUNT II: TITLE VII DISCRIMINATION CLAIMS - HOSTILE WORK ENVIRONMENT AGAINST THE CITY OF ALBUQUERQUE

97.     Plaintiffs incorporate each allegation above as though fully set forth herein.

98.     As set forth above, Plaintiffs were subjected to harassment and adverse job conditions by Defendant City because of their sex.  The harassment and adverse job conditions were frequent, severe, humiliating, and unreasonably interfered with Plaintiffs' work performance.  It also constituted a continuing course of conduct.

99.     On information and belief, Defendant City knew that Defendant Padilla had previously engaged in sexual harassment, but the City refused to take effective corrective action. Defendant City is therefore liable for the harassment Plaintiffs experienced.

100.    Further, Defendant City clothed Defendant Padilla with the absolute authority to terminate any employee at his whim, which stifled employees' ability to complain about his conduct andallowed his conduct to go unchecked.

14

101.    The aforementioned conduct was sufficiently severe or pervasive as to alter the terms of Plaintiff's conditions of employment and created a hostile work environment.

102.    Defendant City's wrongful actions caused Plaintiffs damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity and loss of income, loss of promotion opportunities, and psychological harm, anxiety and distress.

103.    The conduct of Defendant City was intentional, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiffs' rights so as to warrant punitive damages.


## COUNT III: TITLE VII CLAIMS - RETALIATION
## AGAINST THE CITY OF ALBUQUERQUE

104.    Plaintiffs incorporate each allegation above as though fully set forth herein.

105.    In reporting their claims of discrimination to the HRD and the City's EEO, Plaintiffs engaged in conduct protected by Title VII.

106.    Defendant City retaliated against Plaintiffs because Plaintiffs engaged in conduct protected by Title VII by subjecting Plaintiffs to adverse employment actions.  The adverse employment actions include, but are not limited to, subjecting Plaintiffs to sexual harassment and discrimination, transferring Plaintiffs without cause and in violation of existing policy and procedures, demoting Plaintiffs, stripping Plaintiffs of their management responsibilities, denying Plaintiffs access to information, equipment and resources necessary for their employment, isolating and ostracizing Plaintiffs, and stripping Plaintiffs of meaningful job duties and responsibilities, loss of income and loss of promotion opportunities and pay raises.

107.    Defendant City had no legitimate, non-retaliatory, non-pretextual reason for subjecting Plaintiffs to these adverse employment actions.

15

108.    Plaintiffs' protected conduct was a but for cause of Defendant City's wrongful actions.

109.    Defendant City's wrongful actions caused Plaintiffs damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity and loss of income, loss of promotion opportunities, and psychological harm, anxiety and distress.

110.    The conduct of Defendant City was intentional, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiffs' rights so as to warrant punitive damages.

## COUNT IV: NOTICE OF APPEAL UNDER THE NEW MEXICO HUMAN RIGHTS ACT

111.    Plaintiffs incorporate each allegation above as though fully set forth herein.

112.    Defendant City engaged in a series of unlawful discriminatory and retaliatory practices as described above in violation of NMSA 1978 § 28-1-7.

113.    Defendant's violations of the New Mexico Human Rights Act caused Plaintiffs damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity and loss of income, loss of promotion opportunities, and psychological harm, anxiety and distress.

114.    Plaintiffs have satisfied all administrative prerequisites to bringing suit under the NMHRA.

115.    Defendant City is liable under *respondeat superior* for the acts of its employees, agents, servants and/or representatives, including but not limited to, Defendant Padilla, Defendant Schultz, Defendant Chavez, Pete Dinelli, Bruce Pearlman, and Nick Bakas.

116.    Plaintiffs hereby requests a trial *de novo* on their NMHRA claims.

117.    The conduct of Defendant City was intentional, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiffs' rights so as to warrant punitive damages.


**COUNT V:  42 U.S.C. §§ 1981 and 1983 DENIAL OF EQUAL PROTECTION AGAINST DEFENDANT PADILLA**

118.    Plaintiffs incorporate each allegation above as though fully set forth herein.

119.    Defendant Padilla singled out Plaintiffs and purposefully treated them in a spiteful and malicious manner so that they would be unlawfully and unjustifiably terminated and humiliated in their place of employment.  Further, Defendant Padilla intentionally targeted Plaintiffs as managers of Communications when other similarly situated employees were not treated in the same manner.

120.    Defendant Padilla's actions violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

121.    The conduct of the Defendant Padilla was objectively unreasonable, as well as intentional, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiffs' rights so as to warrant punitive damages.

122.    Defendant Padilla's wrongful actions caused Plaintiffs damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity and loss of income, loss of promotion opportunities, and psychological harm, anxiety and distress.

## COUNT VI:  42 U.S.C. § 1983 SUPERVISORY LIABILITY
## AGAINST DEFENDANT CHAVEZ AND DEFENDANT SCHUTLZ

123.     Plaintiffs incorporate each allegation above as though fully set forth herein.

124.     Defendant Padilla intentionally and deliberately discriminated against Plaintiffs because of their gender in the workplace contrary to Title VII and he violated their constitutional rights under the Equal Protection Clause of the Fourteenth Amendment.

125.     Defendant Schultz and Defendant Chavez were, at all material times, policy makers at the City.  Therefore, Defendant City is responsible for their acts.

126.     Defendant Schultz and Defendant Chavez had, at all material times, supervisory authority over Defendant Padilla.

127.     Defendant Schultz and Defendant Chavez had actual or constructive knowledge of potential for Defendant Padilla to discriminate against women under his supervision such as Plaintiffs.

128.     Because Defendant Schultz and Defendant Chavez clothed Defendant Padilla with absolute authority during his tenure at Communications and did not properly supervise or monitor him, the Defendants acquiesced in his conduct by failing to stop it.

129.     Defendants' wrongful actions caused Plaintiffs damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity and loss of income, loss of promotion opportunities, and psychological harm, anxiety and distress.

130.     The actions of Defendant Schultz and Defendant Chavez were the moving force behind, and directly caused, Plaintiffs' constitutional injuries as set forth above.

18

131.    The conduct of Defendant Schultz and Defendant Chavez was objectively unreasonable, as well as intentional, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiffs' rights so as to warrant punitive damages.

## COUNT VII: CLAIM FOR PROCEDURAL DUE PROCESS VIOLATION UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT SCHULTZ AND DEFENDANT CHAVEZ

132.    Plaintiffs incorporate each allegation above as though fully set forth herein.

133.    According to the terms of their employment, Plaintiffs could only be transferred or demoted according to City policy.  As such, Plaintiffs had a constitutionally protected property interest in their continued employment as Assistant Manager and Manager of Communications.

134.    Defendant Schultz and Defendant Chavez' decision to transfer and demote Plaintiffs from their positions without providing them with notice of the reasons for their transfer or demotion, an explanation of the City's evidence against them, or an opportunity to present their side of the story was against City policy.

135.    Defendant Schultz and Defendant Chavez never provided Plaintiffs with a hearing of any kind either before or after their transfer and demotion.

136.    These Defendants' actions as set forth above violated Plaintiffs' right to Due Process pursuant to the Fourteenth Amendment to the United States Constitution.

137.    These Defendants' acts and omissions caused the Plaintiffs damages and injuries including, but not limited to, lost pay and benefits, lost earning capacity, lost opportunities for

promotion, lost job responsibilities and prestige, damage to reputation, and emotional and psychological distress.

138.    The conduct of Defendant Schultz and Defendant Chavez was objectively unreasonable, as well as intentional, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiffs' rights so as to warrant punitive damages.

## COUNT VIII:
## CLAIM FOR MUNICIPAL LIABILITY AGAINST DEFENDANT CITY

139.    Plaintiffs incorporate each allegation above as though fully set forth herein.

140.    Defendants Padilla, Schutlz and Chavez were, at all relevant times, policy-makers for the City.

141.    The actions of Defendant Padilla, Defendant Schultz, and Defendant Chavez have caused Plaintiffs constitutional injuries as set forth above.

142.    The Defendant City maintained a custom, policy, or practice of encouraging or condoning the discrimination of women, and of retaliating against management and supervisory level employees who report sexual harassment, and this custom, policy, or practice proximately caused Plaintiffs' damages and injuries as set forth herein.

143.    The Defendant City had actual notice that their conduct as set forth above with regard to the Defendants was substantially certain to result in constitutional violations and the City chose to disregard the risk of harm.

144.    The Defendant City's acts and omissions caused the Plaintiffs damages and injuries including, but not limited to, lost pay and benefits, lost earning capacity, lost

20

opportunities for promotion, lost job responsibilities and prestige, damage to reputation, and emotional and psychological distress.

## COUNT IX:
## CLAIM FOR BREACH OF IMPLIED EMPLOYMENT CONTRACT
## AGAINST DEFENDANT CITY

145.     Plaintiffs incorporate each allegation above as though fully set forth herein.

146.     Plaintiff Sanchez was offered and accepted a position of employment as the Manager of Communications with the City in or about October, 2005.  Plaintiff Webb was offered and accepted a position of employment as Assistant Manager of Communications with the City in or about August, 2006.  In each instance, Plaintiffs carried out the specific tasks required of their position, and the City of Albuquerque accepted their performance and paid their salary.

147.     During Plaintiffs tenure as Manager and Assistant Manager, the authority to demote or transfer Plaintiffs was limited by the express written provisions of City's policies.

148.     Defendant Chavez, Defendant Schultz along with Pete Dinelli, Bruce Pearlman, Deputy Chief Castro, Nick Bakas, Captain Warfield and City of Albuquerque demoted Plaintiffs on or about April 9, 2007, contrary to City policy.

149.     Defendant City's acts and omissions constitute a breach of an implied employment contract, for which governmental immunity from suit is waived under NMSA 1978 § (1976) based on the written terms of the applicable City policies.

150.     Defendant City had actual notice of this incident.

151.     Defendant City's wrongful acts as set forth above caused Plaintiffs damages and injuries, including but not limited to lost pay and benefits, lost earning capacity, lost opportunities for promotion, lost job responsibilities and prestige, damage to reputation, and emotional and psychological distress.

## JURY TRIAL DEMAND

152.     Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER

WHEREFORE, Plaintiffs prays for judgment as follows:

1.     Compensatory damages against the Defendants in an amount to be determined by the finder of fact;

2.     Punitive damages as allowed by law against Defendants in an amount to be determined by the fact finder;

3.     Reasonable costs and attorneys' fees incurred in bringing this action as permitted by law;

4.     Pre- and post-judgment interest; and

5.     Any other relief this Court deems just and appropriate

Respectfully submitted,


_____
Robert J. Gorence
Louren Oliveros
Gorence & Oliveros, P.C.
Attorneys for Plaintiffs
201 12th St. NW
Albuquerque, NM 87102
505-244-0214