# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO

MARLYN WEBB and
PAULINE SANCHEZ,

        Plaintiffs,

vs.                                                                     Civ. No. 08-0411 MV/LAM

MICHAEL PADILLA, *et al.*,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendants City of Albuquerque, Martin

Chavez and Raymond Schultz's Motion for Summary Judgment, filed February 20, 2009 **[Doc.**

**No. 95]** and Plaintiffs' Motion for Partial Summary Judgment Against the City of Albuquerque

on Counts 3 and 4 of the Complaint, filed February 20, 2009 **[Doc. No. 98]**.  The Court, having

considered the motions, briefs, relevant law and being otherwise fully informed, finds that part of

Defendants'[1] motion is well-taken, while part is not well-taken, and accordingly Defendants'

motion will be **GRANTED in part** and **DENIED in part**.  The Court further finds that

Plaintiffs' motion is not well-taken and will be **DENIED**.

---

[1]  The term "Defendants" is used herein to refer to the City of Albuquerque, Martin
Chavez and Raymond Schultz.  The sole count against defendant Michael Padilla, Count V, was
dismissed pursuant to Rule 41(a)(2) on June 9, 2009 **[Doc. No. 158]**.

## FACTUAL BACKGROUND[2]

This case arises out of alleged employment discrimination against Plaintiffs Marlyn

Webb and Pauline Sanchez.  Prior to mid-April 2007, Ms. Webb and Ms. Sanchez worked as

Assistant Communications Manager and Communications Manager, respectively, of the City of

Albuquerque's 911 Call Center ("Communications").

Communications had historically suffered from numerous problems including lack of

funding, understaffing, low pay, high employee turnover, and low employee moral, which

predated the time Plaintiffs assumed management roles.  During their tenure at Communications,

Plaintiffs took steps to overcome these problems to no avail.

In 2006, the City of Albuquerque ("the City") tasked Michael Padilla, then general

manager/director of the City's 311 Call Center, with evaluating and devising a plan to address

the perceived problems at Communications.  It was Mayor Chavez's decision to bring

Mr. Padilla to Communications, a female-managed and female-dominated division of the

Albuquerque Police Department.  Though background checks of Communications employees are

routinely required due to the sensitivity of the databases to which they have access, the City did

not obtain a background investigation of Mr. Padilla before assigning him this task.  A

background check of Mr. Padilla that was completed *after* the alleged incidents at issue in this

case, however, revealed that there had been allegations of improper conduct and harassment

made against Mr. Padilla prior to his employment by the City.  Plaintiffs, however, have

---

[2]  The facts are stated in the light most favorable to Plaintiffs because Defendants are
seeking summary judgment on all remaining counts, while Plaintiffs are seeking summary
judgment on only two counts.  When the Court analyzes the counts upon which Plaintiffs seek
summary judgment, it will restate the facts as necessary in the light most favorable to
Defendants.

submitted no evidence that the either Mayor Chavez or Chief Schultz knew of these prior allegations against Mr. Padilla at the time Mr. Padilla was placed at Communications. There was, however, one internal complaint that had been brought against Mr. Padilla due to his conduct while employed at the City's 311 Call Center. That complaint did not involve sexual harassment, but alleged *inter alia* that Mr. Padilla had improperly provided interview questions to a female job applicant with whom he had an ongoing relationship.

After conducting a six-week review of Communications beginning in early November 2006, Mr. Padilla devised his Productivity Enhancement Plan ("PEP"). In January 2007, Mr. Padilla began working at Communications several days a week to implement the PEP. As manager/director of the City's 311 Call Center, Mr. Padilla's direct supervisor was Gail Reese, Chief Financial Officer of the City; Ms. Reese, however, was not present at Communications.

While implementing the PEP at Communications, Mr. Padilla essentially acted as a director of Communications and supervised Plaintiffs and other Communications employees. Plaintiffs were instructed to implement the PEP and were told by Mr. Padilla that any form of resistance to the plan could result in their termination. Deputy Chief Michael Castro, who oversaw Communications and supervised Plaintiffs, was told by Mayor Chavez that he had "better make this plan work" and testified that he felt his job would be in jeopardy if he was unable to make the plan work **[Doc. No. 98, Ex. 1 at 59]**. While Plaintiffs admit that they voiced certain concerns regarding the PEP, they contend that they worked diligently to implement the PEP and were not, as Mr. Padilla contends, resistant to the plan.

Between the time Mr. Padilla began implementing the PEP at Communications in January 2007 and early March 2007, Plaintiffs allege that Mr. Padilla engaged in a pattern of

harassment and discrimination against Plaintiffs and other female employees, which included the following:

- In January 2007, Mr. Padilla met with Plaintiffs and a number of other employees to discuss the PEP.  During that meeting he told employees that he had the full authority of Mayor Chavez to do anything and to get rid of anybody.  He told the employees that they needed to "get on board" with the PEP or find another place to work.  During this time, Mr. Padilla was staring at Ms. Webb.  When she asked "Why are you looking at me?," he stated "That's right, I am looking at you, Darlin'" **[Doc. No. 95, Ex. B at Vol. I, pgs. 102, 106 & 109]**.

- Several times during the period he was at Communications, Mr. Padilla made comments to the effect that "It may be 2007, but in my world it's the 1950s or the 1960s and women stay home and make tortillas and have babies" **[Doc No. 95, Ex. B at Vol. I, pgs. 123-24; Doc. No. 95, Ex. F at 108-09 & 114-15]**.

- Mr. Padilla informed Ms. Webb that he was writing a book entitled "Psycho Men, and the Women Who Made Them That Way" and told her that the book included chapters with titles such as "What Executive Women Really Need is a Great Big Hug" and "Psycho Women I Have Dated" **[Doc. No. 95, Ex. B at Vol. I, pgs. 132-34]**.

- Prior to a meeting to brief workers on certain changes, Ms. Webb and swing shift employees were engaged in an informal discussion about a news story about two high school girls who ran away to Espanola with their boyfriends.  When Mr. Padilla walked into the room, he commented several times to the room full of

people that he and Ms. Webb were going to run away to Las Vegas.  When people
looked at Ms. Webb, she told them that Mr. Padilla was kidding, but Mr. Padilla
continued to tell people that they were going to run away to Las Vegas both
during the meeting and in conversations thereafter.  Ms. Webb testified that
Mr. Padilla's comments made her uncomfortable and that when she asked him to
stop telling people they were running away to Las Vegas, he just smiled at her.

- Mr. Padilla told Ms. Sanchez that women liked to be treated one way outside of
the workplace but insist upon being treated like men in the business world.

- After calling Ms. Sanchez while she was at dinner and insisting that she come in
to answer phones, Mr. Padilla suggested that he take Ms. Sanchez and APD
Communications Training Supervisor Michelle Lopez (who had also come in) out
for drinks so that he could find them "a one-legged man" so they would not be so
angry.  The one-legged man comment offended Ms. Sanchez, as she understood it
to be sexual in nature and reported it to the EEO **[Doc. No. 95, Ex. F at 111-14]**.

- Mr. Padilla commented publicly that he needed the men to back him up.

- Mr. Padilla attempted to hug Communications employee Tina Torres, causing her
upset.

- Mr. Padilla paid an inordinate amount of attention to Communications employee
Robin Martinez.

- Communications employee Michelle Lopez, who had observed Mr. Padilla
driving by her house, feared that he was stalking her after she had repeatedly
declined to date him and that he was also retaliating against Plaintiffs as a result

of her refusal to date him.

•      Mr. Padilla was generally disrespectful of Plaintiffs.  He would yell at

Ms. Sanchez and he would interrupt Ms. Webb's work to have her fetch people

for him.  He would also present Ms. Webb's ideas as his own.

While Plaintiffs acknowledge that Mr. Padilla was also openly critical of the few male

employees working at Communications, including Johnny Vigil and Claude Sanchez, there is

testimony that he treated females differently and with less respect.  As a result of Mr. Padilla's

conduct, Plaintiffs suffered emotional distress and Ms. Sanchez suffered increasing bouts of

hives.

During the period that Mr. Padilla was at Communications, Ms. Sanchez had

conversations with her supervisor, Deputy Chief Castro, in which she relayed concerns she had

about Mr. Padilla's conduct and management style.  She also spoke to Deputy Chief Castro

specifically about the concerns Ms. Lopez had that Mr. Padilla was stalking her and retaliating

against Plaintiffs as a result of Ms. Lopez's refusal to date him.

Though Plaintiffs acknowledge that the City had a policy prohibiting discrimination and

that they knew they could file an EEO complaint, Plaintiffs testified that they were reluctant to

do so for fear of losing their jobs and thus tried to accommodate Mr. Padilla during his

temporary sojourn at Communications.  Ultimately, however, in early March 2007 (just about

two months after Mr. Padilla began implementation of the PEP at Communications), Plaintiffs

decided that they could no longer bear the situation and decided that they would file an EEO

complaint.

On March 6, 2007, Police Chief Raymond Schultz was informed that Communications

employees intended to file an EEO complaint and the following day, on March 7, 2007,

Plaintiffs (along with eight other female supervisors at Communications) filed their EEO

complaint.  After receiving the complaint, the EEO undertook an investigation, during which

various individuals (including Chief Deputy Castro) were interviewed.  While the investigation

was being conducted, Mr. Padilla was removed from Communications.  As a result of the

investigation, the EEO determined that Mr. Padilla had engaged in certain instances of

inappropriate conduct (both with respect to the earlier 311 complaint and the complaint from

Communications employees) and it recommended discipline.  On April 16, 2007, before Padilla

was disciplined, he resigned.  Upon his resignation, he sent an e-mail to employees of the City's

311 Call Center that was highly critical of the 911 management team and the allegedly "false

accusations" that had been made against him **[Doc. No. 149, Ex. 18]**.

At approximately 4:00 p.m. on the day the EEO complaint was filed, March 7, 2007, and

after City officials were aware of the complaint, Mr. Padilla circulated his 60-Day Report on the

implementation of the PEP.  In that report, he recommended the "reassignment of the current

management team" at Communications **[Doc. No. 95, Ex. H]**.  There is a factual dispute as to the

scope of Mr. Padilla's knowledge about the EEO complaint at the time he submitted his 60-Day

Report.  Additionally, Defendants have submitted evidence that Mr. Padilla had begun

preparation of his 60-Day Report prior to March 7 and that he had previously expressed concerns

about Plaintiffs' management.  On the other hand, Plaintiffs have submitted evidence that they

had received positive feedback from Mr. Padilla just prior to March 7, 2007.

On April 2, 2007, less than one-month after the EEO complaint was filed, Mr. Padilla

sent an e-mail to the City's Chief Administrative Officer, Dr. Bruce Perlman **[Doc. No. 149, Ex.**

**17**], which again recommended Plaintiffs' removal from Communications, stating:

> Per your request earlier today, the following is a list (in order of importance) for individuals that will need to be reassigned away from the APD Communications Center:
>
> 1. Pauline Sanchez
> 2. Marlyn Webb
> 3. Tina Torres
> 4. The technical assistant, Claude Sanchez, will need specialized training on all reporting and analytical tools available to monitor the performance of the team, or be reassigned and the position backfilled with a qualified technical assistant.

One week later, on April 9, 2007, Plaintiffs were informed that they were being transferred out of Communications and that they would no longer have any job responsibilities as Manager and Assistant Manager of Communications. Defendants contend that the City's Chief Administrative Officer, Dr. Bruce Perlman, made the decision to transfer Plaintiffs, in consultation with Chief Schultz. Initially, Plaintiffs believed that their transfers were temporary and expected to return to Communications after Mr. Padilla finished implementing the PEP, but thereafter Plaintiffs learned that they would not be returning to Communications. Plaintiffs were not given an explanation for their transfer, nor any formal paperwork, and there is conflicting testimony from various City officials as to why Plaintiffs were transferred.

In moving for summary judgment, Defendants contend that Plaintiffs were transferred "because it was determined that many of the historic and ongoing problems in the 911 Center were the result of poor management, because Plaintiffs were resistant to changes to improve the 911 Center, and because Plaintiffs' continued presence in the 911 Center created fear among some employees and contributed to low employee morale" **[Doc. No. 95 at 6-7]**. Plaintiffs, however, have submitted evidence that they had no negative evaluations while employed at the City and that their supervisors, prior to Mr. Padilla, thought highly of them, believed they were

skilled at their jobs, and did not support their transfers.

When they were transferred, Plaintiffs were stripped of their management and supervisory duties and responsibilities (with the exception that Ms. Sanchez continued to supervise Ms. Webb) and removed to a remote location, yet they continued to retain their titles of Manager and Assistant Manager of Communications and had no changes to their pay or benefits.  While Plaintiffs felt that the first remote location at which they were placed was wholly inadequate, the City allowed Plaintiffs to move to another location—a shared office with two desks facing each other.  Initially following the transfer, Plaintiffs had no computers to do their work, then computers were set up for them but thereafter taken away, and finally Plaintiffs were given laptops, which did not allow them access to information at Communications or anywhere in the City's system.  As a result of their transfers, Plaintiffs had no support staff, were allowed only restricted access to Communications, and were cut off from other Communications employees, some of whom were instructed not to speak with Plaintiffs.  While Ms. Webb was ultimately assigned to work on a project that she felt was meaningful, Ms. Sanchez remained wholly dissatisfied with the work she was given following the transfers.  Ms. Webb is still working for the City, while Ms. Sanchez retired in March 2008.

Shortly after the transfer of Plaintiffs, Chief Deputy Castro was also removed from the Communications chain of command (though he retained the responsibilities he had over various other units).

On April 4, 2008, Marlyn Webb and Pauline Sanchez filed a complaint against Michael Padilla, Raymond Schultz, Martin Chavez and the City asserting the following claims:  Count I: Title VII Discrimination Claims–Disparate Treatment Against the City; Count II: Title VII

Discrimination Claims–Hostile Work Environment Against the City; Count III: Title VII

Claims–Retaliation Against the City; Count IV: Notice of Appeal Under the New Mexico

Human Rights Act; Count V: 42 U.S.C. §§ 1981 and 1983 Denial of Equal Protection Against

Defendant Padilla; Count VI: 42 U.S.C. § 1983 Supervisory Liability Against Defendant Chavez

and Defendant Schultz; Count VII: Claim for Procedural Due Process Violations Under

42 U.S.C. § 1983 Against Defendant Schultz and Defendant Chavez; Count VIII: Claim for

Municipal Liability Against the City; and Count IX: Claim for Breach of Implied Employment

Contract Against the City.

   As noted in footnote 1, Count V, the only count against Mr. Padilla, was subsequently

dismissed pursuant to Rule 41(a)(2).  The remaining Defendants are now seeking summary

judgment on Counts I-IV and VI-IX, while Plaintiffs are seeking summary judgment on Counts

III and IV.

## LEGAL STANDARD

   Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "In ruling on summary

judgment, the court must resolve all ambiguities and draw all factual inferences in favor of the

non-moving party."  *Zurich N. Am. v. Matrix Serv., Inc.,* 426 F.3d 1281, 1287 (10th Cir. 2005)

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## DISCUSSION

## I.    Count I: Disparate Treatment

   Count I of Plaintiffs' complaint alleges that the City engaged in disparate treatment of

Plaintiffs because of their gender in violation of Title VII, 42 U.S.C. §§ 2000e *et seq*.  Disparate treatment claims that are supported by indirect evidence of discrimination are examined under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.  Under that analysis, a plaintiff carries the initial burden of establishing a *prima facie* case of discrimination.  *McDonnell Douglas Corp.*, 411 U.S. at 802; *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  In order to establish a *prima facie* case of disparate treatment, a plaintiff must show:  (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the defendant treated similarly situated employees differently.  *See Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).  If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for taking the adverse employment action.  *McDonnell Douglas Corp.*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253.  If the defendant meets this burden, the burden then shifts back to the plaintiff to establish that the proffered reason is pretextual, *e.g.*, unworthy of belief.  *McDonnell Douglas Corp.*, 411 U.S. at 804; *Burdine*, 450 U.S. at 253.

Defendants argue that they are entitled to summary judgment because Plaintiffs cannot establish two of the three elements of a *prima facie* case of disparate treatment—namely, that Plaintiffs suffered an adverse employment action and that similarly-situated male employees were treated in a different manner.  Additionally, Defendants argue that even if Plaintiffs could make out a *prima facie* case of discrimination, the Plaintiffs were transferred for legitimate business reasons and there is no evidence of pretext.

This Court finds that summary judgment is appropriate because Plaintiffs have not

11

presented evidence from which a rational trier of fact could find that the City treated similarly-situated male employees differently.[3]  Employees are considered "similarly-situated" when "they (1) have dealt with the same supervisor; (2) were subject to the same work standards; and (3) had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *MacKenzie v. Denver*, 414 F.3d 1266, 1277 (10th Cir. 2005); *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (recognizing that "[s]imilarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline" and that courts "should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated" (internal quotations omitted)).

In opposing Defendants' summary judgment motion, Plaintiffs rely on the treatment of sworn officer Deputy Chief Castro.  Plaintiffs assert that Deputy Chief Castro "was similarly situated to Plaintiffs because he was subject to the same rules and regulation[s], and he had the same supervisors, Padilla, then Chief Schultz, Dr. Perlman and the Mayor" and that he was treated more favorably than Plaintiffs for breaking the same rules **[Doc. No. 149 at 27]**. Plaintiffs' argument, however, is unsupported by their own evidence.  First, the evidence cited by Plaintiffs fails to establish that Deputy Chief Castro was similarly situated.  Instead, the

---

[3]  As Plaintiffs have not presented evidence that similarly-situated male employees were treated differently and thus cannot establish a *prima facie* case of disparate treatment, this Court need not address Defendants' remaining arguments (namely, that Plaintiffs cannot establish they suffered an adverse employment action or that the reason for the action was pretextual) with respect to Count I.

testimony on which Plaintiffs rely establishes that as Deputy Chief for the Administrative

Support Bureau of the Albuquerque Police Department, Deputy Chief Castro had responsibilities

over not just Communications but multiple units and sections including human resources,

personnel, recruiting, the academy, all off-site facilities including training facilities and ranges,

records management, the IT area, the comprehensive information technology project, and

basically anything else affiliated to civilian employees **[Doc. No. 149, Ex. 24 at 4-5]**.  Thus

Deputy Chief Castro's management responsibilities for Communications were only a subset of

his responsibilities.  Moreover, while there is evidence that Deputy Chief Castro was part of the

Communications' chain of command (and, in fact, had supervisory responsibilities over

Plaintiffs), there is no evidence cited by Plaintiffs to support their assertion that sworn officer

Deputy Chief Castro, who oversaw multiple units and sections and was higher on the chain of

command, was subject to the same rules and regulations Plaintiffs, who were civilian employees,

nor is there any evidence that Deputy Chief Castro engaged in the same conduct at

Communications.

     Second, even had Plaintiffs submitted evidence sufficient to establish that Deputy Chief

Castro was similarly situated to Plaintiffs, Defendants would still be entitled to summary

judgment because there is no evidence that Deputy Chief Castro was treated more favorably than

Plaintiffs.  It is undisputed that Deputy Chief Castro was removed from the chain of command at

Communications around the same time Plaintiffs were removed.  While Plaintiffs argue that

Deputy Chief Castro was treated more favorable because he retained other supervisory and

managerial responsibilities, Plaintiffs present no evidence that he retained any such

responsibilities with respect to Communications.  Rather, the evidence upon which Plaintiffs rely

refers to the responsibilities he retained over other units and sections.  This evidence does not

establish disparate treatment; rather, it reflects differences in the role Plaintiffs and Deputy Chief

Castro played with respect to the Albuquerque Police Department prior to the events at issue.

Because Plaintiffs have not presented evidence from which a rational trier of fact could

find that the City treated similarly-situated male employees differently, Defendants' motion for

summary judgment is granted as to Count I.

## II.    Count II: Hostile Work Environment

Count II of Plaintiffs' complaint seeks recovery from the City on the basis that as a result

of Mr. Padilla's conduct, Plaintiffs were subjected to a hostile work environment in violation of

Title VII.  Defendants seek summary judgment arguing that (1) Plaintiffs' evidence does not

support the inference that Plaintiffs were subject to a hostile work environment and (2) there is

no basis to hold the City liable for Mr. Padilla's conduct.  This Court addresses each of these

arguments below.

### A.  Hostile Work Environment

Title VII prohibits an employer from subjecting an employee to a hostile work

environment on the basis of the employee's sex.  *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64

(1986).  A hostile work environment exists when a "workplace is permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys.,*

*Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citation omitted).  In *Harris*, the United

States Supreme Court recognized that there is both an objective and a subjective component to a

hostile work environment claim.  The Court explained:  "Conduct that is not severe or pervasive

14

enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 21-22.  The Court further explained that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* at 23.

Defendants argue that they are entitled to summary judgment because Plaintiffs cannot establish that Mr. Padilla's alleged conduct was unwelcome, nor can they establish that his conduct was sufficiently severe or pervasive to rise to the level of a hostile work environment. *See Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (recognizing that to establish the existence of a hostile work environment, a plaintiff must prove *inter alia* that the alleged harassment was unwelcome and that due to its severity or pervasiveness, the harassment altered a term, condition or privilege of plaintiff's employment).  This Court finds that there are genuine issues of material fact as to both of these elements.

As to whether Mr. Padilla's conduct was unwelcome, this Court finds that there is sufficient evidence to support an inference that his conduct was unwelcome and subjectively perceived by Plaintiffs as creating a hostile work environment.  Among other things, the record contains evidence that Ms. Webb voiced her discomfort about Mr. Padilla's conduct to Ms. Sanchez; that Ms. Sanchez perceived certain comments made by Mr. Padilla to be sexual

harassment and that she had meetings with Deputy Chief Castro discussing the comments that Mr. Padilla was making and the manner in which he was treating her and other female Communications employees; that Mr. Padilla's public comments about running off to Las Vegas with Ms. Webb made Ms. Webb uncomfortable and that she had asked him to stop, but that he had continued making such comments; that despite their fear of losing their jobs, which initially prevented Plaintiffs from filing a formal complaint, Plaintiffs did, in fact, file a complaint with the EEO just months after Mr. Padilla began working at Communications; that Ms. Sanchez suffered physical ailments, including hives, and emotional distress as a result of the environment created by Mr. Padilla; and that Ms. Webb suffered emotional distress and was prescribed an antidepressant as a result of Mr. Padilla's conduct and her removal from Communications.

Similarly, this Court finds that there are material issues of fact as to whether Mr. Padilla's conduct was sufficiently severe or pervasive to rise to the level of a hostile work environment. Defendants are correct in noting that Title VII is not a "general civility code" and that to be actionable, "conduct must be extreme" and consist of more than "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations omitted). However, as discussed above, in evaluating a hostile work environment claim, a trier of fact must look at the record as a whole and "must examine the totality of the circumstances, including 'the context in which the alleged incidents occurred.'" *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1262 (10th Cir. 1998) (quoting *Meritor*, 477 U.S. at 69). "Such a thorough examination of the record is required because 'the very term "environment" indicates that allegedly discriminatory incidents should not be examined in isolation.'" *O'Shea v. Yellow*

16

*Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999) (quoting *Penry*, 155 F.3d at 1262).

"Evidence of a general work atmosphere therefore—as well as evidence of specific hostility

directed toward the plaintiff—is an important factor in evaluating the claim."  *Hicks v. Gates*

*Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987); *accord O'Shea*, 185 F.3d at 1097;  *Penry*,

155 F.3d at 1262.  Because "the severity and pervasiveness evaluation" is "quintessentially a

question of fact," it "is particularly unsuited for summary judgment."  *O'Shea*, 185 F.3d at 1098

(internal quotations omitted).

In this case, Plaintiffs have presented evidence from which a reasonable jury could infer

that Mr. Padilla's conduct was sufficiently severe or pervasive to create a sexually hostile work

environment.  Despite the fact that Mr. Padilla was only present at Communications for

approximately two months (and only on certain days of those months), Plaintiffs have submitted

evidence that Mr. Padilla repeatedly made comments to the effect that it may be 2007, but in his

house it was the 1950s and women stay home, make tortillas and have babies; evidence that

Mr. Padilla told Ms. Webb he was writing a book entitled "Psycho Men, And The Women Who

Made Them That Way," which included chapters such as "What Executive Women Really Need

Is A Great Big Hug"; evidence that Mr. Padilla repeatedly told others at the office that he and

Ms. Webb were going to run off to Las Vegas; evidence that Mr. Padilla told Ms. Sanchez that

women liked to be treated one way outside of the workplace, but insist on being treated like men

in the business world; evidence that Mr. Padilla told employees at a meeting that he had the full

authority of the Mayor, could get rid of anybody, and that they had better get on board with the

PEP or find another place to work and then looked at Ms. Webb and told her "That's right, I am

looking at you, Darlin'"; evidence that after Ms. Sanchez and Ms. Lopez were called into work

one evening, Mr. Padilla suggested that he take them out for drinks so that he could find them "a one-legged man" so they would not be so angry; evidence that Mr. Padilla attempted to hug a female Communications employee, causing her upset; evidence that Mr. Padilla was paying an inordinate amount of attention to another female Communications employee; evidence that though Mr. Padilla was critical of both male and female employees, he treated women in Communications differently and with less respect; and evidence that after Ms. Lopez, a female Communications supervisor, repeatedly declined to date Mr. Padilla, he had driven by her house and that she feared he was retaliating against her.  Based on this evidence, the Court finds that there is a genuine issue of material fact as to whether Mr. Padilla's conduct created a hostile work environment and it thus declines to grant Defendants summary judgment on this basis.

### B. Employer Liability

Defendants also argue that the City is entitled to summary judgment as to Count II of Plaintiffs' complaint because, even assuming a hostile work environment existed, there is no basis for holding the City liable for Mr. Padilla's conduct.  In the companion cases of *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the United States Supreme Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."  *Burlington*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.  However, when no tangible employment action has been taken against the employee, the employer may raise an affirmative defense protecting it from vicarious liability by showing:  "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably

failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.  As an alternative to vicarious liability, a Plaintiff may also establish liability by proving the employer was negligent–-in other words, "[t]he employer may be held liable if it knew, or should have known, about the hostile work environment and failed to respond in an appropriate manner." *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1270 (10th Cir. 1998).

It is undisputed that the City had a policy prohibiting sexual harassment, that Plaintiffs knew of this policy and knew they could file a complaint with the EEO, and that when Plaintiffs filed a complaint with the EEO on March 7, 2007, an investigation was conducted and the City recommended that Mr. Padilla be disciplined.  However, there is also evidence from which a reasonable jury could infer that before Plaintiffs lodged their formal EEO complaint, the City knew, or should have known, about Mr. Padilla's conduct and yet failed to appropriately respond or to exercise reasonable care to prevent sexually harassing behavior.[4]  Among other things, there is evidence that just weeks after Mr. Padilla began implementing his PEP at Communications, Ms. Sanchez and Ms. Lopez met with Deputy Chief Castro to discuss concerns Ms. Lopez had about the behavior of Mr. Padilla, including her fear that he may be stalking her. There is also evidence that prior to the filing of the EEO complaint, Ms. Sanchez had discussed with Deputy Chief Castro some of the inappropriate comments being made by Mr. Padilla, as well as her concerns regarding his treatment of her and other women at Communications, including the inappropriate attention he was giving one female Communications employee.

---

[4] Because there are material issues of fact as to whether the City should have known about Mr. Padilla's conduct and whether the City exercised reasonable care, this Court need not address whether the transfer of Plaintiffs out of Communications in April 2007 constituted a tangible employment action pursuant to *Burlington/Faragher*.

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673-74 (10th Cir. 1998) (employer deemed to have knowledge of harassment reported to management-level employee).  In addition, there is evidence that the City's EEO representative Angela Baldwin—who investigated not just the EEO complaint brought by Plaintiffs, but also an earlier complaint related to Mr. Padilla's conduct at the City's 311 Call Center—became aware during her investigations that there were allegations of inappropriate conduct and possible sexual harassment that predated Mr. Padilla's employment by the City.  Finally, there is evidence that despite the aforementioned, Mr. Padilla's work at Communications was largely unsupervised.[5]  Accordingly, this Court declines to grant summary judgment on Count II.  *Wright-Simmons*, 155 F.3d at 1270-71 (where Plaintiff complained to supervisors prior to lodging formal complaint, a reasonable jury could find that a response coming only after a formal complaint was filed was not reasonable).

## III.   Count III: Retaliation

Count III of Plaintiffs' complaint alleges that the City transferred Plaintiffs out of Communications in retaliation for filing the EEO complaint in violation of Title VII.  Both Plaintiffs and Defendants seek summary judgment as to this count.

Plaintiffs' retaliation claim is examined under the *McDonnell Douglas* burden-shifting analysis set forth above.  Under that analysis, the plaintiff carries the initial burden of establishing a *prima facie* case of retaliation.  *McGowan v. City of Eufala*, 472 F.3d 736, 741

---

[5]  While Plaintiffs also fault the City with failing to conduct a background check prior to employing Mr. Padilla at Communications, the purpose for which a background check is routinely conducted on Communications employees relates to the sensitivity of the databases to which they have access rather than an effort to prevent sexual harassment in the workplace. Accordingly, absent evidence that the City had reason to suspect that a background check would reveal inappropriate conduct, its failure to conduct a background check is not itself probative of the City's alleged negligence in preventing sexual harassment.

(10th Cir. 2006).  Once plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for taking the adverse action. *Id.*  If the employer offers a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to show that the proffered reason is pretextual.  *Id.*

In order to establish a *prima facie* claim for retaliation under Title VII, a plaintiff must show that (1) she engaged in protected opposition to discrimination, (2) she was subject to an action that a reasonable employee would have found to be materially adverse, and (3) a causal connection exists between the protected activity and the materially adverse action.  *Id*.  Neither party disputes that Plaintiffs engaged in a protected activity by lodging a complaint with the EEO.  Defendants, however, contend that Plaintiffs cannot demonstrate that their transfer constituted a materially adverse action, cannot establish a causal connection between the filing of the EEO complaint and the alleged adverse action, and cannot establish that the City's proffered justification for the transfer was pretextual.  Plaintiffs, by contrast, argue that there is no material issue of fact as to any element of their claim and they are thus entitled to summary judgment. This Court finds that material questions of fact preclude summary judgment for either side.

### A.  Materially Adverse Action

The Court finds that there is a material question of fact as to whether Plaintiffs suffered an adverse action—namely, their transfer out of Communications.  In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the United States Supreme Court held that to establish an "adverse action" in the context of a Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from

making or supporting a charge of discrimination."  548 U.S. at 68 (internal quotations omitted).

Applying this standard, the Supreme Court held that a jury could reasonably find that an

employee's reassignment from forklift duty to standard track laborer tasks constituted an adverse

employment action, despite the fact that both sets of duties fell within the same job description,

where there was evidence that the forklift operator position was considered a more prestigious

assignment that required greater qualifications.  *Id.* at 70-71 (noting that the EEOC has

consistently found retaliatory work assignments to be classic example of forbidden retaliation).

The Court explained:  "To be sure, reassignment of job duties is not automatically actionable.

Whether a particular reassignment is materially adverse depends upon the circumstances of the

particular case, and should be judged from the perspective of a reasonable person in the

plaintiff's position, considering all the circumstances."  *Id.* at 71 (internal quotations omitted);

*see also McGowan*, 472 F.3d at 742 (recognizing the need to examine claims of adverse action

on a case-by-case basis so that consideration can be given to the unique factors relevant to the

situation at hand).  Even prior to *Burlington Northern & Santa Fe Railway Co.*, however, the

Tenth Circuit had recognized that reassignment of an employee with significant changes in job

responsibilities could constitute an adverse employment action.  *See Duncan v. Manager, Dep't*

*of Safety, City & County of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005) (recognizing that the

transfer of an experienced police officer to a position in the police academy after she filed an

EEOC complaint due to concerns for her safety constituted an adverse action); *Dick v. Phone*

*Directories Co.*, 397 F.3d 1256, 1268 (10th Cir. 2005) (recognizing that an adverse employment

action includes acts that constitute "a significant change in employment status, such as hiring,

firing, failing to promote, ***reassignment with significantly different responsibilities***, or a

decision causing a significant change in benefits," but is not limited to such acts (emphasis added

and internal quotations omitted)); *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1215 (10th

Cir. 2003) (although plaintiff retained same pay and job classification, evidence of the dramatic

change in her work duties following her transfer was sufficient to find an adverse action).

Defendants have presented evidence that Plaintiffs retained their job titles, as Manager and

Assistant Manager of Communications, after their transfer; that they had no change in pay or

benefits as a result of the transfer; and that they were provided with meaningful job

responsibilities after the transfer.  By contrast, Plaintiffs have presented evidence that, as a result

of the transfer, Plaintiffs were moved to another location and physically isolated from other

Communications employees; were stripped of their previous management and supervisory duties

(with the exception that Ms. Sanchez continued to supervise Ms. Webb); were stripped of their

prior job duties; no longer had support staff; and had difficulties obtaining access to computers

and equipment necessary to do their jobs.  This evidence presents a material question of fact as

to whether Plaintiffs suffered an adverse employment action.

**B.  Causal Connection**

This Court likewise finds that there is a material question of fact as to whether there is a

causal connection between Plaintiffs' filing of their EEO complaint and the transfer of Plaintiffs.

On the one hand, Plaintiffs have submitted evidence that on March 6, 2007, City

management was advised of Plaintiffs' intent to file the EEO complaint against Mr. Padilla; that

on the morning of March 7, 2007, the City received notice that the EEO complaint had been

filed; that on the afternoon of March 7, 2007, Mr. Padilla submitted his 60-Day Report calling

for the removal of management at Communications; that in late March/early April 2007, some of

the EEO charges were upheld; that on April 2, 2007, Mr. Padilla sent an e-mail to Dr. Perlman

listing the individuals that he believed needed to be reassigned away from Communications in

order of importance, the top two of which were Plaintiffs; that on April 4, 2007, a Notice of

Discipline was issued to Mr. Padilla; that on approximately April 9, 2007, Plaintiffs were

transferred out of Communications and relieved of their management duties and responsibilities

while Mr. Padilla was slated to complete implementation of the PEP; and that shortly thereafter,

Plaintiffs were informed that they would not be returning to their positions at Communications.

Given the extremely close temporal proximity between Plaintiffs' filing of the EEO complaint

and their removal from Communications, a reasonable factfinder could infer the existence of a

causal connection based on the evidence Plaintiffs have submitted.  *McGowan*, 472 F.3d at 744

("[T]he required link between the protected activity and subsequent adverse employment action

can be inferred if the action occurs within a short period of time after the protected activity.");

*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (finding

24-day period "sufficient to allow an inference that a causal connection existed" between the

internal grievance and the challenge action); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171,

1179 (10th Cir.1999) (comparing cases where six-week period gave rise to inference of a causal

connection, but three-month period did not); *Otero v. N.M. Corr. Dep't*, Case No. 08-CV-907

JC/LFG, 2009 WL 1849278, at *9 (D.N.M. June 9, 2009) (holding that a reasonable jury could

infer a causal connection despite the absence of any direct evidence that defendant intended to

retaliate where the period between the protected activity and the adverse action was just over one

month).

    Defendants, on the other hand, have submitted evidence that would tend to rebut a causal

connection, including evidence that Mr. Padilla had previously recommended the removal of

Plaintiffs; that he had begun work on his 60-Day Report prior to March 7; that Mr. Padilla did

not know the content of the EEO complaint or specifically who had brought the complaint at the

time he submitted his 60-Day Report; that Mr. Padilla's April 2, 2007 e-mail recommending the

reassignment of Plaintiffs also recommended that Claude Sanchez either receive technical

training or be reassigned (though he was not a participant in the EEO complaint) and only

recommended the reassignment of three of the ten employees who had participated in the EEO

complaint; that the final decision to transfer Plaintiffs was made by the City's CAO, Dr. Bruce

Perlman, not Mr. Padilla; and that Deputy Chief Castro (who was not one of the employees that

filed the EEO complaint but who had been interviewed as part of the EEO investigation) was

also removed, while other employees who were involved in filing the Complaint were not

removed.

In light of the above evidence, this Court finds that there are questions of material fact as to

whether a causal connection exists and that this issue is therefore inappropriate for summary

judgment.

### C.  Legitimate Business Reason/Pretext

Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the

defendant to present evidence that it has a legitimate business reason for the adverse action.  This

Court finds that the City has met this burden by presenting evidence that Plaintiffs' transfers

were part of an overhaul of the Communications management and that the City decided to move

forward with this overhaul because it believed some of the historic and ongoing problems in

Communications were the result of poor management, that Plaintiffs were resistant to the PEP,

25

and that Plaintiffs' continued presence at Communications created a fear among some

employees.  *See E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1316-17 (10th Cir. 1992) (employer is

required only to articulate a facially nondiscriminatory reason for the action).  Accordingly, the

burden shifts back to Plaintiffs to establish that the City's proffered reasons were pretextual–*i.e.,*

unworthy of belief.  In order to establish pretext, a plaintiff must offer evidence to call into

question the honesty and good faith of the City's stated business reasons.  "Pretext can be shown

by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally

find them unworthy of credence and hence infer that the employer did not act for the asserted

non-discriminatory reasons."  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)

(internal quotations omitted); *accord Argo*, 452 F.3d at 1203.

     In this case, Plaintiffs have submitted evidence that the problems at Communications

predated Plaintiffs' management of Communications and were the result of lack of funding and

understaffing, not Plaintiffs' management; that Plaintiffs were never disciplined nor did they

ever receive negative evaluations; that, apart from Mr. Padilla, Plaintiffs' supervisors and prior

supervisors held them in high regard; that Plaintiffs worked to diligently implement the PEP; and

that there are inconsistences in the explanations given for Plaintiffs' transfer by various City

employees.  This Court finds that Plaintiffs' evidence is sufficient to create a material issue of

fact as to whether the decision to transfer Plaintiffs was pretextual, but is insufficient to establish

pretext as a matter of law.  Accordingly, this Court denies both parties motions for summary

judgment as to Count III.

**IV.   Count IV: Appeal Under the New Mexico Human Rights Act**

While both parties move for summary judgment as to Plaintiffs' claims under the New

Mexico Human Rights Act (Count IV), neither party provides any separate argument as to these

claims.  Instead, the parties acknowledge that Plaintiffs' claims under the New Mexico Human

Rights Act, NMSA 1978 §§ 28-1-1 *et seq.* ("NMHRA") are based on the same conduct that

gives rise to Plaintiffs' Title VII claims.  *Juneau v. Intel Corp.*, 127 P.3d 548, 551 (N.M. 2005)

(Title VII burden-shifting methodology applies to claims brought under the NMHRA).

Accordingly, for the reasons set forth in Sections II and III, above, this Court denies both parties'

motions for summary judgment as to Count IV.

**V.   Count VI: Section 1983 Supervisory Liability**

County VI of Plaintiffs' complaint alleges supervisory liability against Mayor Chavez and

Chief Schultz based on Mr. Padilla's alleged violation of Plaintiff's constitutional rights under

the Equal Protection Clause of the Fourteenth Amendment.[6]  As Plaintiffs acknowledge, "there is

no concept of strict supervisor liability under section 1983."  *Jenkins v. Wood*, 81 F.3d 988, 994

(10th Cir. 1996) (internal quotations omitted).  "'This does not mean that a supervisor may not

be liable for the injuries caused by the conduct of one of his subordinates.  It does mean that his

liability is not vicarious, that is, without fault on his part.'"  *Serna v. Colo. Dep't of Corr.*, 455

F.3d 1146, 1151 (10th Cir. 2006) (quoting *Scull v. New Mexico*, 236 F.3d 588, 600 (10th Cir.

2000)).  "In order to establish a § 1983 claim against a supervisor for the unconstitutional acts of

his subordinates, a plaintiff must first show the supervisor's subordinates violated the

---

[6]  While Count VI of Plaintiffs' complaint also alleges that Mr. Padilla discriminated
against Plaintiffs in violation of Title VII, Title VII does not permit personal capacity suits
against individual supervisors.  Instead, Title VII only permits claims to be asserted against an
employer—in this case the City.  *Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996).

constitution" and then "must show an 'affirmative link' between the supervisor and the violation, namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates."  *Serna*, 455 F.3d at 1151; *see also Holland v. Harrington*, 268 F.3d 1179, 1187 (10th Cir. 2001).  Moreover, mere negligence is insufficient to hold a supervisor liable under section 1983; instead, "a plaintiff must establish that the supervisor acted knowingly or with 'deliberate indifference' that a constitutional violation would occur."  *Serna*, 455 F.3d at 1151-52 (quoting *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)).  Acceptable evidence of active participation or acquiescence includes "the supervisor's personal participation, his exercise of control or direction, or his failure to supervise."  *Serna*, 455 F.3d at 1152 (internal quotations omitted); *accord Holland*, 268 F.2d at 1187; *Green*, 108 F.2d at 1302.

Defendants argue that they are entitled to summary judgment both because Plaintiffs have failed to establish that Mr. Padilla violated their constitutional rights under the Equal Protection Clause of the Fourteenth Amendment and because Plaintiffs have failed to demonstrate that Mayor Chavez or Chief Schultz actively participated in any purported constitutional violation.

As a preliminary matter, this Court notes that although Plaintiffs acknowledge that Mayor Chavez and Chief Schultz may be held liable under 42 U.S.C. section 1983 only if Mr. Padilla violated Plaintiffs' constitutional rights, Plaintiffs' brief fails to adequately address the alleged violation of their constitutional rights under the Equal Protection Clause of the Fourteenth Amendment and instead merely refers the Court to Plaintiffs' prior arguments.  As noted in Section I above, Plaintiffs' have not submitted sufficient evidence to establish that they were treated differently than similarly-situated male employees with respect to any adverse employment action.  *See Mitchell v. City of Wichita*, No. 04-3199, 140 Fed. Appx. 767, 783,

28

2005 WL 1635381, at *10 (10th Cir. July 13, 2005) (unpublished) ("'The equal protection clause is triggered when the government treats someone differently than another who is similarly situated.'" (quoting *Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth.*, 933 F.2d 853, 859 (10th Cir. 1991)).  Moreover, when Mr. Padilla moved for summary judgment as to Count V of Plaintiffs' complaint—the Count that alleges Mr. Padilla's actions violated Plaintiffs' rights under the Equal Protection Clause—Plaintiffs moved to dismiss the Count V, rather than opposing Mr. Padilla's summary judgment motion **[Doc. Nos. 96-97 & 141]**.  Nonetheless, as this Court has found that summary judgment in Defendants' favor is inappropriate as to Plaintiffs' hostile work environment claim (see Section II, above), this Court will assume for purposes of this motion that Plaintiffs could establish that Mr. Padilla violated their rights under the Equal Protection Clause.  Even with this assumption, however, this Court finds that Mayor Chavez and Chief Schultz are entitled to summary judgment as to Plaintiffs' count for supervisory liability because Plaintiffs cannot show that either Mayor Chavez or Chief Schultz actively participated in Mr. Padilla's purported constitutional violation.

With respect to Mayor Chavez, Plaintiffs argue:  "Mayor Chavez actively participated in the violation of Plaintiffs' rights by authorizing Padilla and Perlman to 'fix' or 'clean up' Communications by any means necessary" **[Doc. No. 149 at 35]**.  While Plaintiffs have submitted evidence that Mayor Chavez was personally involved in placing Mr. Padilla at Communications as a part of the team that was assigned to clean up the mess at Communications and that Mayor Chavez instructed CAO Bruce Perlman to use the full extent of his authority to get this job done, simply directing employees to do their jobs is insufficient to establish that a supervisor actively participated or acquiesce in the violation of constitutional rights.  *See, e.g.,*

*Serna*, 455 F.3d at 1153-54 (state director of prisons not liable for alleged unconstitutional use of force by correction officers despite the fact that director authorized the use of the SORT team and received periodic progress reports about the operation, because there was no evidence he directed the particular use of force).  Plaintiffs have offered no evidence that Mayor Chavez directed Mr. Padilla to discriminate against Plaintiffs, knew of the alleged discrimination, or acted with deliberate indifference.[7]  Accordingly, as there is no affirmative link between Mr. Padilla's alleged violation of Plaintiffs' constitutional rights and Mayor Chavez, Mayor Chavez is entitled to summary judgment as to Count VI.

This Court likewise finds that Chief Schultz is entiled to summary judgment as to Count VI.  As to Chief Schultz, Plaintiffs allege that he was involved in the placement of Mr. Padilla at Communications and the failure to conduct the required background check and that he was personally involved in the failure to supervise Mr. Padilla at Communications.  The evidence Plaintiffs submits in support of these allegations, when viewed in the light most favorable to Plaintiffs, however, fails to establish an affirmative link between Chief Schultz and the alleged violation of Plaintiffs' Equal Protection Rights by Mr. Padilla.  While there is evidence that Chief Schultz received briefings regarding Communications and was aware that about half of the employees at Communications did not like Mr. Padilla and his changes, there is no evidence that Chief Schultz had any knowledge of alleged discrimination by Mr. Padilla prior to the time Plaintiffs filed the EEO complaint.  Moreover, in the absence of evidence that Chief

---

[7]  While Plaintiffs also submit testimony that Mayor Chavez did not concern himself with whether a background check on Mr. Padilla was needed or precisely who would report to who in terms of the personnel chain of the team he was putting together, this evidence is likewise insufficient to establish that Mayor Chavez acted with knowing or deliberate indifference that a constitutional violation would occur.  Instead, the evidence merely establishes that Mayor Chavez delegated certain details to others.

Schultz had knowledge of Mr. Padilla's alleged discrimination, neither the fact that Chief

Schultz left supervisory responsibilities over Mr. Padilla to Ms. Reese (Mr. Padilla's supervisor

at 311), nor the fact that he failed to conduct a background check (which was routinely

conducted on Communications employees due to the sensitivity of the databases to which they

have access, not due to concerns about preventing sexual harassment), is sufficient to establish

an affirmative link between Chief Schultz and Mr. Padilla's alleged discrimination.

Finally, Plaintiffs allege that Chief Schultz participated "in the removal of Plaintiffs [from

Communications] without cause or process" **[Doc. No. 149 at 35]**.  There is evidence to support

this allegation.  However, this evidence does not establish an affirmative link between Chief

Schultz and Mr. Padilla's alleged violation of Plaintiffs' rights under the Equal Protection

Clause.  As this evidence relates solely to conduct occurring after Mr. Padilla was removed from

Communications pending the EEO investigation, it cannot establish that Chief Schultz actively

participated in the earlier discrimination by Mr. Padilla.  While this evidence is relevant to

Plaintiffs' due process claims, Plaintiffs have plead a separate count alleging that Mayor Chavez

and Chief Schultz violated their due process rights (Count VII of Plaintiffs' complaint);

accordingly, we address this evidence and Plaintiffs' due process claims below.

For the foregoing reasons, this Court finds that Mayor Chavez and Chief Schultz are

entitled to summary judgment as to Count VI of Plaintiffs' complaint.

## VI.   Count VII: Section 1983 Procedural Due Process Violations

Count VII of Plaintiffs' complaint alleges that Mayer Chavez and Chief Schultz violated

Plaintiffs' procedural due process rights by transferring Plaintiffs out of Communications

without providing Plaintiffs an explanation of the City's evidence against them or an opportunity

to be heard in violation of City policy.  Defendants move for summary judgment on the basis

that Mayor Chavez and Chief Schultz have qualified immunity from suit.[8]

The qualified immunity doctrine shields government officials from suits for civil damages

"insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982).  In contrast to a typical motion for summary judgment, which places the burden on the

moving party, when a defense of qualified immunity is raised, the plaintiff bears the burden of

establishing both that (1) "the facts taken in the light most favorable to the plaintiff show that the

defendant's conduct violated a constitutional right" and (2) "the right violated was clearly

established."  *Poolaw v. Marcantel*, 565 F.3d 721, 728 (10th Cir. 2009).[9]  "The relevant,

dispositive inquiry in determining whether a right is clearly established is whether it would be

clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."

*Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled in part by Pearson v. Callahan*, 129 S. Ct.

808 (2009); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (To be clearly

established, "[t]he contours of the right must be sufficiently clear that a reasonable official would

understand that what he is doing violates that right."); *Cortez v. McCauley*, 478 F.3d 1108, 1114

(10th Cir. 2007) (*en banc*) (summary judgment is appropriate if the law did not put the official

---

[8]  As this Court grants summary judgment on this basis, it does not consider Defendants'
separate argument that Mayor Chavez is also entitled to summary judgment on the basis that he
did not participate in Plaintiffs' transfer.

[9]  In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the United States Supreme Court held
that lower courts must move sequentially through these two prongs in assessing whether
qualified immunity applies—thus addressing the "clearly established" prong only if first finding
the violation of a constitutional right.  In *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009),
however, the Supreme Court held that lower courts have the discretion to decide which of the
two prongs to consider first.

"on notice that his conduct would be clearly unlawful").  If a plaintiff meets his or her burden of

demonstrating both that the defendant's actions violated a constitutional right and the right was

clearly established at the time of the alleged conduct, then the defendant, as the moving party,

must satisfy the usual summary judgment standard by showing that there are no genuine issues

of material facts and that he or she is entitled to judgment as a matter of law.  *Clark v. Edmunds*,

513 F.3d 1219, 1222 (10th Cir. 2008).

　　This Court finds that Plaintiffs have not presented sufficient evidence to survive summary

judgment as to Count VII, as the law is not clearly established that Plaintiffs had a property

interest in their particular positions at Communications and were thus entitled to due process

before their transfers.  "The Due Process Clause of the Fourteenth Amendment ensures that one

cannot be deprived of a property right absent due process of law."  *Potts v. Davis County*, 551

F.3d 1188, 1192 (10th Cir. 2009).  Thus, in order to prevail on their Due Process claim, Plaintiffs

must first establish that they had a property interest in their positions at Communications.  While

the Due Process Clause is a source of protection for property, it is not a source of property rights.

Rather property interests "are created and their dimensions are defined by existing rules or

understandings that stem from an independent source."  *Bd. of Regents of State Colls. v. Roth*,

408 U.S. 564, 577 (1972).  Accordingly, in determining whether Plaintiffs had a property interest

in their positions at Communications, this Court looks to State and local law.  *Ewers v. Bd. of

County Comm'rs*, 874 F.2d 736, 738-39 (10th Cir. 1989); *see also Potts*, 551 F.3d at 1192

(noting the "general rule" that "no protected property interest is implicated when an employer

reassigns or transfers an employee absent a specific statutory provision or contract term to the

contrary," but also recognizing that if a governmental entity's laws "place substantive

restrictions on a government actor's ability to make personnel decisions" then the employee has a protected property interest (internal quotations omitted)).

In arguing that they had a property interest in their positions, Plaintiffs rely on section 902 of the City's Personnel Rules and Regulations, as well as the New Mexico Supreme Court's holding in *Lovato v. City of Albuquerque*, 742 P.2d 499 (N.M. 1987).  Section 902 of the Personnel Rules and Regulations provides that "[e]mployees may be disciplined by written reprimand, suspension, demotion or dismissal," while section 902.2 provides the procedure that must be followed before discipline is imposed, including providing notice to the employee and an opportunity to respond **[Doc. No. 149, Ex. 29]**.[10]  Plaintiffs contend that their transfers out of Communications were "demotions" and thus section 902 is applicable and establishes a property interest in their positions.  Defendants, on the other hand, argue that Plaintiffs were not demoted, but merely reassigned or transferred, and thus the rules applying to disciplinary actions are inapplicable.  It is undisputed that Plaintiffs' job title did not change as a result of their transfer and that Plaintiffs had no change in either pay or benefits.  In light of these undisputed facts, the Court finds that section 902 would not have put a reasonable official on notice that he or she could not transfer Plaintiffs without providing them due process.

The other authority upon which Plaintiffs rely, *Lovato v. City of Albuquerque*, 742 P.2d 499 (N.M. 1987), is also insufficient to meet Plaintiffs' burden of showing their rights were clearly established.  In *Lovato*, the Supreme Court of New Mexico held that a City of

_____

[10]  The City's Merit Ordinance, C.O.A. §§ 3-1-1, *et seq.*, cited by Defendants, likewise contains parallel language proving that "[e]mployees may be disciplined by written reprimand, suspension, demotion or dismissal" and setting forth the procedures that must be followed before discipline is imposed, as well as a specific procedural mechanism that enables employees who have been demoted for disciplinary reasons to appeal the discipline to the City's Personnel Board.  C.O.A. §§ 3-1-23 and 3-1-25.

Albuquerque employee who had spent thirteen years in an assignment position, which had

resulted in a five percent pay raise from his prior job, had a property interest in his assignment

position notwithstanding the fact that City rules provided that assignment positions were not

permanent and gave administrative heads the discretion to reassign people at any time.  742 P.2d

at 502.  When the City decided to remove Mr. Lovato from assignment status, he lost the extra

pay.  *Id.* at 500.  Although the New Mexico Supreme Court held that "Lovato's interest in

continued employment in the same position clearly rose to the level of a constitutionally

protected property interest," read in context, the additional salary associated with the position

was clearly important to the ruling, and the Supreme Court of New Mexico specifically

mentioned Mr. Lovato's grade and pay rate in the assigned position in determining he had a

protected interest, as well as the City's action in retaining him in the position for thirteen years.

*Id.* at 502.

Notably, seven years after *Lovato*, the Supreme Court of New Mexico held that the

temporary suspension of an employee with no loss of pay was not a due-process violation

because the public employee's only property interest was in the income associated with the job.

*Bd. of Educ. of Carlsbad Mun. Sch. v. Harrell* 882 P.2d 511, 518-19 (N.M. 1994) ("Because the

Board did not deprive Harrell of any property interest by suspending him with pay, he was not

entitled to due process protections prior to suspension.").

This Court finds that *Lovato*, particularly when viewed in light of *Harrell*, is insufficient to

put Defendants on notice that Plaintiffs had a clearly established property right in their specific

positions and job duties, where Plaintiffs had not held those particular positions for a number of

years prior to their transfer and there was no change in pay, no change in benefits, and no change

35

in title as a result of the transfer.  *See Chavez-Rodriguez v. City of Santa Fe*, No. CIV 07-0633

JB/DJS, 2008 WL 5992271, at *11-12 (D.N.M. Oct. 9, 2008) (finding transfer that would result

in loss of supervisory responsibilities but no change in pay did not implicate a property right as

"[r]ead together, [*Lovato* and *Harrell*] stand for the proposition that New Mexico recognizes a

property interest in public employment, but that it is an interest tied to the financial benefits that

flow from the position, and not in other aspects of a job, such as the title, prestige, or level of

power and responsibility accompanying a particular position.").

As Plaintiffs have not met their burden of proving that the property right of which they

were allegedly deprived (if it existed) was clearly established, Mayer Chavez and Chief Schultz

are entitled to summary judgment on the basis of qualified immunity as to Plaintiffs' due process

claims.

## VII.  Count VIII: Municipal Liability

A municipality may not be held liable under 42 U.S.C. section 1983[11] simply because it

employs a person who violated a plaintiff's federally protected rights.  *Monell v. Dep't of Soc.*

*Servs.,* 436 U.S. 658, 691, 694 (1978).  Instead "[a] plaintiff suing a municipality under section

1983 for the acts of one of its employees must prove:  (1) that a municipal employee committed a

constitutional violation, and (2) that a municipal policy or custom was the moving force behind

the constitutional deprivation."  *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313,

1316 (10th Cir.1998).  Ordinarily, proof of a single incident of unconstitutional activity is not

sufficient to impose municipal liability.  *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th

---

[11]  While Plaintiffs' complaint also alleges that the City is liable under 42 U.S.C. section
1981, section 1981 is inapplicable as it applies to claims of racial discrimination.  *See*
*Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 971 (10th Cir. 1979) ("Section 1981 does not
apply to sex or religious discrimination.").

Cir. 1993).  In the case where a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with final authority to establish municipal policy with respect to the action ordered.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-84 (1986); *see also Butler*, 992 F.2d at 1055 (the plaintiff must prove the single incident "was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker"). In addition to demonstrating conduct properly attributable to the municipality, "[t]he plaintiff must also demonstrate that through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

In this case, Plaintiffs have made no attempt to establish that the City had an official policy of discrimination on the basis of sex or of demoting or punishing those who brought EEO complaints.  Instead, Plaintiffs base their claim of municipal liability on their allegation that final policymakers were responsible for the alleged violations of Plaintiffs' rights.  In analyzing this Count, the Court divides Plaintiffs claims into two groups:  (1) those based on Mr. Padilla's alleged discrimination and (2) those arising out of the subsequent transfer of Plaintiffs out of Communications.

### A.    Municipal Liability For Claims Arising Out Of Mr. Padilla's Conduct

This Court finds that Plaintiffs have not presented evidence sufficient to support a finding that Mr. Padilla was a final policymaker, nor have they submitted evidence sufficient to establish

37

that Mayor Chavez or Chief Schultz delegated policymaking authority to Mr. Padilla.  Thus,

Plaintiffs' only remaining argument is that the City is liable due to the actions of Mayor Chavez

and/or Chief Schultz, as final policymakers for the City.  However, as discussed in more detail in

Section V above (addressing supervisory liability), while Plaintiffs have submitted evidence that

Mayor Chavez was personally involved in placing Mr. Padilla at Communications to clean up

the mess, they have offered no evidence that Mayor Chavez directed Mr. Padilla to discriminate

against Plaintiffs, knew of the alleged discrimination at Communications, or knew of

Mr. Padilla's alleged history of discrimination at the time he was placed at Communications.

Likewise, there is no evidence that Chief Schultz had any knowledge of the alleged

discrimination by Mr. Padilla at Communications prior to the time Plaintiffs filed the EEO

complaint, nor is there evidence that Chief Schultz was aware that Mr. Padilla had an alleged

history of discrimination.  Accordingly, Plaintiffs' evidence is insufficient to establish that either

Mayor Chavez's or Chief Schultz's conduct was the moving force behind the alleged violation of

Plaintiffs' constitutional rights and that either of them acted with deliberate indifference to

Plaintiffs' rights.

In *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997), the United States

Supreme Court specifically cautioned that "[c]ases involving constitutional injuries allegedly

traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be

held liable for an injury it did not cause" and thus emphasized the need for courts to "adhere to

rigorous requirements of culpability and causation" so that municipal liability does not

improperly collapse into *respondent superior* liability.  520 U.S. at 415.  Applying these rigorous

requirements, the Supreme Court held that a county was not liable for the use of excessive force

by one of its police officer based on its policymaker's decision to hire that officer without

adequate screening—despite the fact that the officer had pled guilty to various misdemeanors

(including assault and battery) and the policymakers had actually obtained a report from the

National Crime Information Center prior to hiring the officer.  *Id.*  In contrast, here, there is no

evidence that the City's policymakers were aware that Mr. Padilla had allegedly engaged in prior

discriminatory conduct.  Accordingly, this Court grants summary judgment in favor of the City

as to Plaintiffs' claims that the City is liable for the alleged discrimination by Mr. Padilla.

**B.     Municipal Liability For The Transfer Of Plaintiffs**

This Court, however, denies Defendants' motion for summary judgment as to municipal

liability for any alleged violation of Plaintiffs' rights arising out of the transfer of Plaintiffs from

Communications.  On the record before it, this Court finds that there are material questions of

fact as to whether a final policymaker was responsible for the decision to transfer Plaintiffs such

that the City could be liable should the transfer be found to have violated Plaintiffs' rights.

While Plaintiffs' brief focuses on the respective roles Mayor Chavez and Chief Schultz played in

the decision to transfer Plaintiffs, Defendants contend that CAO Dr. Bruce Perlman was "the

final decisionmaker" and was responsible for the transfer of Plaintiffs **[Doc. No. 95 at 26]**.  As

this is a claim against the City—not any particular individual—this Court finds that there are

material issues of fact as to whether the decision to transfer Plaintiffs was made by a final

policymaker.  Moreover, in contrast to claims based on Mr. Padilla's conduct, here there are no

issues of causation, as the transfer itself is alleged to have violated Plaintiffs' rights.

Accordingly, Defendants' request for summary judgment is denied as to Plaintiffs' claims that

the City is liable for the allegedly improper transfer of Plaitniffs out of Communications.

**VIII.        Count IX: Breach Of Implied Employment Contract**

Finally, Count IX of Plaintiffs' complaint asserts that the City's authority to demote or transfer Plaintiffs was limited by express written provisions of the City's policies, which created an implied employment contract, and that the City breached this implied employment contract when it transferred Plaintiffs without following the required procedures.  Where an employer has established procedures that govern certain employment actions, a sufficiently explicit promise may exist so as to give rise to an implied employment contract.  *Watson v. Blankinship*, 20 F.3d 383, 391 (10th Cir. 1994) (quoting *Hartbarger v. Frank Paxton Co.*, 857 P.2d 776, 779-80, 783 (N.M. 1993)).

As discussed above, both sides acknowledge that the City has ordinances and policies that prohibit the City from disciplining employees, including demoting employees, unless certain procedures are followed.  In moving for summary judgment, the Defendants do not argue that these policies are insufficient to create an implied contract, but rather argue that they are inapplicable as Plaintiffs were not demoted, citing the undisputed facts that there was no change in Plaintiffs' title, pay or benefits as a result of their transfers.  Plaintiffs, on the other hand, argue that the transfers were, in fact, a demotion as Plaintiffs were moved to another location and physically isolated from other Communications employees, were stripped of their previous management responsibilities and job duties, no longer had support staff, and had difficulties obtaining access to computers and equipment necessary to do their jobs.  Neither party presents any evidence regarding the proper interpretation of the term "demotion."  In light of the current record, this Court finds that there is a material issues of fact as to whether Plaintiffs were demoted for purposes of an implied contract claim and thus denies Defendants' motion for

summary judgment as to Count IX.

**CONCLUSION**

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Partial Summary Judgment Against the City of Albuquerque on Counts 3 and 4 of the Complaint, filed February 20, 2009 **[Doc. No. 98]** is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants City of Albuquerque, Martin Chavez and Raymond Schultz's Motion for Summary Judgment, filed February 20, 2009 **[Doc. No. 95]** is **GRANTED in part** and **DENIED in part** as follows:

1.   Summary judgment is granted in favor of the City of Albuquerque on Count I.

2.   Summary judgment is denied on Count II.

3.   Summary judgment is denied on Count III.

4.   Summary judgment is denied on Count IV.

5.   Summary judgment is granted in favor of Raymond Schultz and Martin Chavez on Count VI.

6.   Summary judgment is granted in favor of Raymond Schultz and Martin Chavez on Count VII.

7.   Summary judgment is granted in favor of the City of Albuquerque on Count VIII to the extent Plaintiffs allege that the City of Albuquerque is liable for the conduct of Mr. Padilla, but is denied to the extent Plaintiffs allege that the City of Albuquerque is liable for violations of Plaintiffs' rights resulting from the transfer of Plaintiffs out of Communications.

8.   Summary judgment is denied on Count IX.

DATED this 30th day of September, 2009.

_____

**MARTHA VÁZQUEZ**
**Chief United States District Judge**